UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

CASE NO. 8:19-cr-354-SDM-JSS

v.

CHRISTOPHER DAY

## SENTENCING MEMORANDUM

The United States files this sentencing memorandum responding to Defendant Christopher Day's objections to the Presentence Investigation Report and requesting that the Court sentence Defendant Christopher Day to a guideline sentence.

I.      **Background**

A.      **Offense Conduct**

In June 2016, Homeland Security agents in Vietnam received a phone call referred to law enforcement from the non-governmental organization, Blue Dragon Children's Foundation. The caller was a mother (hereinafter, Xuan) reporting that her minor son, QXD, and two minor nephews had been molested by Day. Xuan explained that Day had access to these boys under the guise that he was an American living in Vietnam to teach English. Xuan described that all three boys reported molestation at the hands of Day during what should have been English lessons. Specifically, QXD reported that Day forcefully took the boy's clothes off and performed oral sex on him. When asked why he did not leave immediately, the minor boy stated that he was afraid of Day.

Through the course of their investigation, Homeland Security agents identified numerous minor boys in Vietnam who had been sexually abused by Day, to include QXD, BQD, ADT, DTT, TXAH, and DTN.  A number of these victims reported that they communicated with Day on Facebook, leading up to their contact. After learning that Day communicated with his victims on Facebook, law enforcement obtained the content of Day's Facebook account, which uncovered numerous additional minor Vietnamese victims and endless chats between Day and minor boys about sex in exchange for money and cheap American merchandise.

More specifically, between 2014 and 2017, Day communicated on Facebook with over 30 minor boys located in Vietnam. These communications included countless requests by Day to engage in sex acts with these boys, including oral sex. Some of Day's communications also included requests for the minor boys to send Day pornographic images of themselves, some of whom complied. Consistently throughout these communications, Day would ask these boys how old they were, and all of the boys responded that they were various ages, between 12 and 18 years.

Also between 2014 and 2017, Day traveled back and forth between Florida and Vietnam, to engage in sex acts with minor boys. In exchange for sex acts, Day promised the boys small amounts of Vietnamese currency and sometimes even American merchandise, such as shoes and hats. During one exchange between

Day and a victim (Victim 1) on Facebook, Day thanked Victim 1 for coming to see

him, stating in part:

> Thanks for coming to my hotel, you did good, I hope to make money, return, and for you to come see me…you are the best child, that's why I gave you shoes, if you came alone, you would have made more money…send me a picture of you playing with your cock.

Later in the conversation, Day asks Victim 1, "What did you do with the money I

gave you?" Victim 1 responds, "I bought food."

In another conversation, Day communicated with B.S., a Vietnamese minor.

Day and B.S. had the following conversation, in part:

> Day:  When I come there in March…I hope you can stay over 1 night with me. I'll give you some money. Your friends can stay over with me too to have fun with the penises. I'll give them some money too.
>
> Day:  Is there any hair around your penis yet
>
> B.S.:  Yes
>
> Day:  When it gets hard, you can make it release sperm
>
> Day:  So, if you're friend and you come over 3 times, the third time you can choose a free pair of shoes.

Day and B.S. continued communicating on Facebook and discussed a price Day

would pay for sex, stating in part:

> Day:  Are you ok if I touch it and suck it; are you ok to suck me. Is kissing ok with you
>
> B.S:  No, no kissing
>
> Day:  If you can't, I will find another kid who needs money to do with I ask.
>
> B.S.:  I will do it.

Day:   3 nights, 1.500.000 VND total[1]

B.S.:   too little

Day:   I'm sure there is a number of children that is willing to do it for 500.000 VND.

B.S.:   I'm coming tomorrow to play with you and how much will you give me

Day:   100,000 dong an hour

B.S.:   Can it be more than 100,000 dong

Day:   You can come over at 1 o'clock for an hour for 150,000 dong, ok…I'll pay you. But if you'll say no and will not play with me, I'll be very sad and I'll send you home on a bus.

During one of Day's trips back into the United States after traveling to Vietnam, he was subject to a border search. Approximately one month after that border search, in October 2017, Day was interviewed by Homeland Security agents about his contact with minors in Vietnam. A second interview was conducted several months later, in February 2018.

Despite these repeated contacts with law enforcement, Day continued to engage with minors. Specifically, between September 2017 and June 2018, Day had an ongoing communication with a Vietnamese boy who represented himself to be 15 years old. This boy lived in close proximity to where Day was living in St. Petersburg, Florida.

---

[1] "VND" refers to Vietnamese dong, the national currency in Vietnam.

In that communication, Day repeatedly asked this boy for oral sex. Day persisted for months in trying to make a meeting happen. Day asked this boy if he could sleep in his bed with him, if Day could go to Vietnam with him, and inquired if the boy knew any other Vietnamese boys that wanted to move to Florida. During the period leading up to his arrest, Day also applied for a position to be a foreign exchange student host. To put it another way, Day could not be deterred from attempting contact with children for his own sexual gratification, even armed with the knowledge that law enforcement at least suspected him of same.

### B.    Procedural History

On August 14, 2019, a federal grand jury returned a four-count indictment, charging Day with two counts of traveling with intent to engage in illicit sexual activity, in violation of 18 U.S.C. § 2423(b), and two counts of attempted enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). Doc. 1. Under the government's theory, Day violated § 2423(b) because he traveled across state and national borders with the intent to engage in commercial sex acts and sexual acts and sexual contact with minors. *See* 18 U.S.C. §§ 2423(f), 2243(a), 2244(a)(4).  He violated § 2422(b) because he used the internet to attempt to entice and coerce two Vietnamese minor boys to engage in prostitution and sexual conduct for which he could be prosecuted under 18 U.S.C. §§ 2423(c), 1591(a), and 1596(a). On September 25, 2019, Day was arraigned and entered a plea of not guilty. Doc. 35. On February 19, 2020, Day entered a guilty plea to all four counts in the Indictment.

Doc. 60. On March 9, 2020, Day's plea was accepted by the Court. Doc. 64.
Sentencing is scheduled for May 21, 2021.

## II.        Presentence Investigation Report

On May 17, 2021, the U.S. Probation Office issued its Final Presentence
Investigation Report.  Doc 118.  The counts of conviction carry a mandatory
minimum sentence of 10 years and a statutory maximum of life.  PSR ¶ 187; 18
U.S.C. §§ 2422(b), 2423(b).  The PSR calculates Day's Criminal History Category as
I and his total offense level at 43, which corresponds to a recommended Guidelines
range of life imprisonment.  PSR ¶¶ 133-34, 188.

## III.       Objections to the Presentence Investigation Report

Day asks the Court for a one-level downward variance in his total offense level
to a level 42.  Def. Br. at 14, Doc. 116.  In support, he claims that his offense level
would have been 42 but for the PSR's inclusion of additional "pseudocounts."  *Id.* at
10-13.  A "pseudocount" refers to an aspect of a defendant's criminal conduct that is
treated as an additional count for the multiple-count adjustment under Chapter
Three, Part D of the Sentencing Guidelines, generally to reflect offenses against
multiple victims.  *See, e.g.,* U.S.S.G. § 2G1.3(d)(1).  He does not otherwise argue
against the application of any specific sentencing enhancement.[2]

---

[2] Day also contends that he is eligible for a downward variance under § 5K2.16 of the
Sentencing Guidelines.  Def. Br. at 7.  That provision, however, applies only when the
defendant discloses and takes responsibility for an offense "prior to the discovery of such
offense, and if such offense was unlikely to have been discovered otherwise."  That did not
happen here.

6

Day's objections are without merit.  The Sentencing Guidelines expressly contemplate pseudocounts for all the victims that fall within the counts of conviction, and the PSR implements the Guidelines as they are written.  In addition, even though Day has not objected to other sentencing enhancements, the calculations in the PSR are fully supported.

    A.    **The PSR Appropriately Includes Pseudocounts for Each Victim of the Charged and Convicted Conduct**

The PSR appropriately includes pseudocounts for each victim of the counts of conviction.  The Guidelines provision that corresponds to Counts One and Two of the indictment, § 2G1.3, expressly contemplates the inclusion of pseudocounts when an individual travels with the intent to abuse more than one minor.  Specifically, § 2G1.3(d)(1) states that "[i]f the offense involved more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the persuasion, enticement, coercion, travel, or transportation to engage in a commercial sex act or prohibited sexual conduct of each victim had been contained in a separate count of conviction."

When Christopher Day flew from Tampa to Vietnam, he did so with the intent to abuse numerous minors, not just one.  Specifically, when he traveled in March 2015, he intended to engage in illicit sexual conduct with at least D.B., B.S., R.T.T., L.V.L., T.R.C.B., and "Victim 1."[3]  PSR ¶¶ 16-27.  When he traveled in February 2016, he intended to engage in illicit sexual conduct with at least L.N.V.,

---

[3] B.S. and D.B. are also victims of Count 3 and 4 of the indictment, respectively.

P.M.T., V.L.H.N., and R.T.T.  PSR ¶¶ 19, 28-32.  Accordingly, the PSR follows § 2G1.3(d)(1) and includes separate pseudocounts for each victim.  PSR ¶¶ 56-125.

Day makes no meritorious argument against the application of § 2G1.3(d)(1) or the inclusion of these pseudocounts in the PSR.  He claims that the pseudocounts punish him for uncharged and unadjudicated conduct, but he pleaded guilty to the full indictment, and the nine pseudocounts referred to above are part of the relevant conduct for those counts.  He cites the case of *United States v. Quiroz* from the Court of Appeals for the Armed Forces, but this case addresses an issue that is particular to the military justice system, it does not interpret the U.S. Sentencing Guidelines, and as far as the government can discern, it has never been relied upon or even mentioned by any civilian court for the argument that Day presents.  55 M.J. 334, 337 (C.A.A.F. 2001) (noting that the concept of "unreasonable multiplication of charges" is rooted in rules that apply to courts-martial and is distinct from the constitutional concept of multiplicity).  The pseudocounts are thus appropriate.

> **B.**     **The PSR Appropriately Includes a Cross-Reference to Section 2G2.1 for Victim L.N.V.**

Because he is a victim of Count Two of the indictment, the pseudocount for victim L.N.V. would ordinarily be scored under § 2G1.3 of the Guidelines.  Section 2G1.3(c)(1), however, contains a cross-reference stating that "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of

producing a visual depiction of that conduct, apply § 2G2.2 … if the resulting offense level is greater than that determined above."

In the course of their Facebook chats, Day caused and enticed L.N.V. to produce child pornography and send it to him.  In particular, Day sent L.N.V. a picture of his penis.  PSR ¶ 29.  In turn, Day asked L.N.V. "can i see yours[?]" and "let me see yours."  L.N.V. complied and sent Day a picture of his penis.  *Id.*  This is precisely the type of conduct that triggers the cross-refence to § 2G2.2, and the PSR thus properly calculates L.N.V.'s pseudocount under § 2G2.1.  *See* PSR ¶ 112.

### C.  The PSR Appropriately Applies Enhancements Under Section 2G1.3(b)(4)

The PSR also appropriately includes enhancements under § 2G1.3(b)(4) of the Sentencing Guidelines.  That two-level enhancement applies when either "(A) the offense involved the commission of a sex act or sexual conduct" or "(B) subsection (a)(3) or (a)(4) applies and the offense involved a commercial sex act."  Day is eligible for the enhancement under either subsection.

The record establishes by a preponderance of the evidence that Day engaged in hands-on sexual conduct with, at minimum, six victims mentioned in the PSR. Other than D.B., American law enforcement was not able to locate and interview these victims in person.  Nevertheless, the Facebook chats establish to a preponderance of the evidence that these victims did meet with Day to engage in hands-on sexual activity.  For example:

- L.N.V.:  The Facebook chats between Day and L.N.V. make clear that they engaged in sexual activity.  For example, Day unambiguously asked L.N.V "was my cock ok for you[?]" and "[d]id you like what we did together; did you like what you did for me in the WC[?]"  PSR ¶ 28..

- Victim 1:  The Facebook chats between Day and Victim 1 likewise strongly imply that they engaged in sexual acts or contact.  For example, after the two discussed sex acts in exchange for money, Day stated "Thanks for coming to my hotel, you did good…" "You are the best child, that's why I gave you shoes, if you came alone, you would have made more money," "What did you buy with the money I gave you?"  PSR ¶ 24.

- D.B.:  D.B. recorded a statement in which he strongly implied that he washed Day's genitals after Day abused another minor.  Although he did not state outright that he touched Day's penis, D.B. told HSI agents that he and a friend met Day at his hotel room, where Day offered them 500,000 VND in exchange for one hour of oral sex.  D.B.'s friend accepted and D.B. waited in the hallway while Day and his friend remained alone in the hotel room.  After his friend emerged from Day's hotel room with 500,000 VND, Day asked D.B. to "wash" him in exchange for 200,000 VND.  Day asked D.B. to get on his knees, but D.B. refused.  After he "washed" Day in exchange for the 200,000 VND, D.B. said that he gave the 200,000 VND away and withdrew

from his friends and family.  D.B. said that Day later apologized to him, and that he has since been reluctant to get on social media.  *See also* PSR ¶ 46.

- L.V.L.:  On the basis of the Facebook chats, it appears that Day and L.V.L. met up in person in Nha Trang after an explicit discussion of sex acts. Afterward, Day asks L.V.L. "do you want to see me again[?]"  PSR ¶ 16.

- B.S.:  After engaging in graphic discussions about sexual activity over Facebook, Day and B.S. made specific plans to meet in person in Nha Trang, Vietnam.  The Facebook chats suggest that they did meet in person on March 15, 2015.  Specifically, after designating a specific meeting place, B.S. tells Day "I'm getting ready to come over to your place."  Shortly thereafter, the conversation between the two stops for several days.  PSR ¶¶ 20-21.

- T.R.C.B:  After engaging in graphic discussions about sexual activity over Facebook, Day and T.R.C.B. made specific plans to meet in Nha Trang, Vietnam at a particular place.  The Facebook chat continues up to the point when they planned to meet.  PSR ¶¶ 22-23.

Even if this were not enough to support the inference that Day actually engaged in sexual acts, sexual contact, or commercial sex acts with these victims, the § 2G1.3(b)(4) enhancement would still apply because Day negotiated and intended to engage in commercial sex acts with each of them.  In *United States v. Carter*, the Eighth Circuit observed that § 2G1.3(b)(4)(A) applies when the offense "*involved the commission* of a sex act or sexual contact," but (b)(4)(B) applies when the offense

"involved a commercial sex act."  960 F.3d 1007, 1011 (8th Cir. 2020).  Because the phrase "the commission of" appears in subsection (b)(4)(A) but not (b)(4)(B), the enhancement may be triggered by something less than "the commission of" a commercial sex act.  As the Eighth Circuit put it, "[b]ecause it does not require 'the commission' of a commercial sex act, the (b)(4)(B) enhancement may be applied, for example, in a case where someone attempts to coerce a minor into committing a commercial sex act, but no sex act ultimately occurs."  960 F.3d at 1011.  Here, Day negotiated commercial sex acts with each of these victims and tried to entice and coerce them into those commercial sex acts.  In accordance with *Carter*, the enhancement under § 2G1.3(b)(4)(B) would apply even if no sex act took place.

### D.   The PSR Appropriately Applies the Vulnerable-Victim Enhancement Under Section 3A1.1(b)

The PSR correctly applies the vulnerable-victim enhancement from § 3A1.1(b) to several of Day's victims.  That provision provides for a two-level enhancement when "the defendant knew or should have known that a victim of the offense was a vulnerable victim," which is a victim of the offense of conviction and any relevant conduct "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1, cmt. 2.  The determination of whether a victim is vulnerable is  fact-intensive and not solely dependent on whether the victim is a member of a particular class.  *See United States v. Frank*, 247 F.3d 1257, 1260 (11th Cir. 2001).

The record establishes by a preponderance that at least six of Day's victims are vulnerable on account of their poverty and their susceptibility to influence by an American visitor with disposable income seeking commercial sex acts.  In particular, Day enticed these unsupervised minors with the prospect of exceedingly small amounts of money in exchange for sexual activity.  He generally offered his victims 100,000 VND for an hour of sexual activity, or 500,000 VND for staying overnight in his hotel room.  *See, e.g.,* PSR ¶¶ 12, 16, 18, 20, 22, 24, 26.  In 2015 and 2016, 100,000 VND was roughly equal to or slightly more than $4.50.[4]  Day also told several of his victims that, if they engaged in sex acts with him multiple times, he would give them shoes or other American merchandise.  *See, e.g.,* PSR ¶¶ 9, 12, 18, 20, 24.  And later, Day specifically remarked to an acquaintance that "Western" boys are more difficult and more expensive, confirming that he specifically targeted poor boys in Vietnam.  PSR ¶ 38.

In addition, there are specific factors for each of the following victims that suggest that they were vulnerable on account of their poverty and thus susceptible to being enticed into sex acts in exchange for a pittance, and even further, that Day targeted them for this reason.  These boys largely lived in Nha Trang, Vietnam, which is a seaside city surrounded by poor fishing villages.

---

[4]  *See* U.S. Department of the Treasury, Bureau of Fiscal Service, "Treasury Reporting Rates of Exchange, Historical Rates," *available at https://www.fiscal.treasury.gov/reports-statements/treasury-reporting-rates-exchange/historical.html* (last visited May 12, 2021).

- <u>D.B.:</u>  During his conversations with HSI agents, D.B. stated that he was from a poor village near Nha Trang.  He further stated that, when Day came to Nha Trang, Day interacted with several of his friends from his village.  He also stated that he initially declined Day's offers but later changed his mind because he was poor.  PSR ¶ 46.

- <u>R.T.T.:</u>  In his chats with R.T.T., Day says that he will be in Nha Trang for 6 days and "I hope to give hungry children some money to play with me," suggesting that he specifically targeted impoverished minors.  PSR ¶ 18.

- <u>L.V.L.:</u>  L.V.L. told Day that he would not engage in sex acts for free because "I need money."

- <u>Victim 1:</u> When Day asked what Victim 1 did with the money Day gave him, Victim 1 replied "I bought food."

- <u>B.S.:</u>  During their Facebook conversations, Day tells B.S. that he wants kissing in addition to oral sex.  At first B.S. says no, but Day says "If you can't, I will find another kid who needs money to do what I ask."  After this, B.S. says that he will do what Day says.  *See* PSR ¶ 20.

- <u>T.R.C.B.:</u>  T.R.C.B. told Day over Facebook that he makes 100,000 VND per day repairing motorbikes.  He also asked Day to "adopt" him, he stated that his parents gave him nothing for his birthday, and he asked Day for a set of clothes for his birthday.

These victims are in numerous ways more vulnerable than other victims of the statutes that Day violated, and they are at least as vulnerable as others to whom the § 3E1.1(b) enhancement has been held to apply, such as others in a "precarious financial situation" or who have bad credit and are targeted for financial offenses, *United States v. Arguedas*, 86 F.3d 1054, 1058 (11th Cir. 1996); *United States v. Page*, 69 F.3d 482, 488-92 (11th Cir. 1995), *superseded by statute on other grounds as recognized in United States v. Edwards*, 728 F.3d 1286, 1292 (11th Cir. 2013), prisoners who do not file taxes and are thus less likely to notice that their identities have been stolen, *United States v. Pierre*, 825 F.3d 1183, 1196 (11th Cir. 2016), cab drivers who are specifically targeted because they must pick up fares, *see Frank*, 247 F.3d at 1259-60, or bank tellers in rural areas with scant police presence, *United States v. Phillips*, 287 F.3d 1053, 1057-58 (11th Cir. 2002).

### E.   Day's Recent Denial of Responsibility for His Crimes Should Preclude Him from Receiving Credit Under Section 3E1.1

Under Section 3E1.1(a) of the Sentencing Guidelines, a defendant receives a two-level reduction in his offense level if he "clearly demonstrates acceptance of responsibility for his offense."  Entry of a guilty plea and truthful admissions to criminal conduct "will constitute significant evidence of acceptance of responsibility," but "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.  A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S.S.G. § 3E1.1, cmt. 3.  The defendant bears the burden of demonstrating that he

is entitled to the reduction under § 3E1.1(a).  *United States v. Williams*, 408 F.3d 745, 756 (11th Cir. 2005).  If subsection (a) applies, then the government may move for an additional one-level decrease if the defendant timely notified authorities of his intention to plead guilty and thus saved taxpayer resources.  U.S.S.G. § 3E1.1(b).

Mr. Day did timely notify the government of his intent to plead guilty.  In so doing, he saved the government not only the efforts of having to prepare for trial, but also the need for the investigative and prosecution team to make a costly trip to Vietnam to interview witnesses for potential trial testimony.  If Day had clearly accepted responsibility for his offense, then the government would move for the additional reduction under § 3E1.1(b) for these reasons.

Unfortunately, however, Day has not clearly demonstrated acceptance of responsibility for his crimes.  Although he admitted his guilt at the plea hearing and apparently again to Dr. McClain, *see* Docs. 100-1 at 49:12-53:18 (Day's admissions to the underlying conduct), 115-1 at 3 (Dr. McClain's statement that Mr. Day is "remorseful regarding his actions"), Day recently sent a letter to the Court purporting to explain why he pleaded guilty.  *See* Doc. 110-1 (the "Letter").

The Letter is flatly inconsistent with any acceptance of responsibility.  In it, he states outright that he "plead[ed] guilty ***not because I was***, but to keep my parents from getting the Wuhan virus and harm[']s way.  That was my goal."  Letter at 2 (emphasis added).  He also claims that he simply said yes to all of Magistrate Judge Sneed's questions but did not understand them.  *Id.*  Nothing in the Letter indicates that Day accepts any responsibility for his offenses.  And to be clear, the Letter

16

amounts to more than idle discussion with cellmates or friends. Instead, it is a direct statement that, despite his earlier statements under oath, Day now contends that he pleaded guilty for reasons other than his guilt.

"A defendant who fails to accept responsibility for all of the crimes he has committed and with which he has been charged is entitled to nothing under § 3E1.1." *United States v. Thomas*, 242 F.3d 1028, 1034 (11th Cir. 2001). Indeed, courts have upheld the denial of acceptance-of-responsibility credit under § 3E1.1 for defendants who downplayed their guilt at sentencing. In *United States v. Sammour*, for example, the Eleventh Circuit affirmed the district court's denial of the § 3E1.1 reduction for a defendant who pleaded guilty to all but two of the counts against him. 816 F.3d 1328, 1341 (11th Cir. 2016). Despite his pleas, he still "continued to downplay his culpability at the sentencing proceedings by stating that someone had 'talked [him] into it'" and "denied that his victims are real persons and that he knew they were real persons" despite evidence to the contrary. *Id.* These positions, the court held, were "inconsistent with acceptance of responsibility" within the meaning of the Guidelines and "outweigh his guilty plea" to the counts in question. *Id.*

In addition, Day's Letter makes assertions about the circumstances of his plea that appear to be untrue. Most significantly, he claims he had a change of heart and decided to withdraw his guilty plea after he entered it before Magistrate Judge Sneed but before the Court accepted it. Letter at 2. At the time, he would have been able to do so without cause under Fed. R. Crim. P. 11(d)(1). According to the Letter, his previous attorney told him that he could not withdraw his plea and was otherwise

nonresponsive until after the Court accepted the plea.  Letter at 2-3.  Day repeated this claim in another letter shortly thereafter.  Doc. 117-1 at 1.  If true, these statements would be extremely troubling.

But they do not appear to be true.  After seeing Day's letter, government personnel retrieved and reviewed certain recorded nonprivileged jail calls that Day made during this time period.[5]  In these calls, Day does express uncertainty to family members about whether he should withdraw his guilty plea and go to trial.  He later tells a family member, however, that he met with his previous attorney in person for four hours on February 26, 2020—seven days after his Rule 11 colloquy, and twelve days before this Court's order accepting the guilty plea.  After the meeting, he said, he fully understood that persisting with his guilty plea would be his best chance to mitigate his sentence.  This is entirely inconsistent with the Letter's narrative that Day tried to contact his attorney to withdraw his plea but she told him he could not withdraw it and otherwise ignored his calls.

In light of the Letter, Day cannot meet his burden that he has clearly accepted responsibility.  Because he is ineligible for reduction under § 3E1.1(a), he cannot receive the benefits of subsection (b).

---

[5]  The government provided these recordings to defense counsel and will make them available to the Court upon request.

## IV.    <u>Argument for Guideline Sentence</u>

The facts of this case and Day's conduct are repulsive and demand a guideline sentence. A guideline sentence is necessary for both future deterrence of these crimes and for the protection of the public against Day. *See* 18 U.S.C. § 3553(a).

The United States recognizes that a sentencing court may not presume that a sentence within the advisory guideline range is reasonable; however, the Guidelines remain a significant and pivotal component of the sentencing process. The Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of Day; and to provide Day with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). A consideration of these factors warrants a guideline sentence.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of the offense are despicable. Day trolled a social media platform, looking for vulnerable victims to extort and prey on. Recognizing that Vietnam, halfway around the world from his home, was full of poor boys desperate for money, Day capitalized on an opportunity to victimize children, going undetected by law enforcement for years.

Day understood the population he preyed on quite well and exploited its particular vulnerabilities. In one Facebook conversation, Day learned that one of his many victims used his earnings from his sexual encounters with Day to buy food for himself. In another conversation, when a victim seemed hesitate to engage with Day, Day threatened to move on to another boy who needed money. Shortly thereafter, that victim complied.

For years, Day flew back and forth to Vietnam under the guise that he was an English teacher. Some boys were lured to Day with promises of money and gifts, but some victims were actually introduced to Day as their English teacher. When he wasn't in Vietnam victimizing children, Day was stateside torturing these same children online, with promises of his return to Vietnam with money and American merchandise. All these boys had to do was engage in sex acts with Day for a few hours, or sometimes overnight. In some instances, bonuses were even awarded if the boys brought friends.

In this case, the nature and circumstances of the offenses are egregious and weigh heavily against Day. While Day has entered a plea to two counts of traveling

and two counts of attempted enticement, his victims far exceed simply a handful of boys. While many victims have been identified, it is conceivable that many more exist, but will never be known.

The pervasiveness of Day's sexual exploitation, clearly demonstrates that Day did not have a solitary lapse in judgment. Rather, Day was quite methodical in his victimization of these boys. In looking at the sheer volume of Facebook chats between Day and his countless victims, it is not a stretch of the imagination to say that Day was obsessed with his sexual escapades in Vietnam. When he wasn't physically in Vietnam, Day was doing everything within his power to remain a strong presence in the lives of his Vietnamese victims.

While in the United States, Day taunted his victims with promises of shoes, hats, and small amounts of money. Once in Vietnam, he tempted them with more money and American goods if they brought friends with them. The nature and circumstances of the offense dictate the need for a guideline sentence.

### B.   Seriousness of the Crime, Promote Respect for the Law, and Need for Just Punishment

As the Eleventh Circuit explained in a child exploitation case, "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 1813 (2011). "Child sex crimes are among the most egregious and despicable of societal and criminal offenses…." *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) (discussing how courts have upheld lengthy

sentences in cases involving child sex crimes as substantively reasonable). Congress has explained that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense." S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59. Because "[t]he seriousness of the crime varies directly with the harm it causes or threatens…" this Court should impose a guideline sentence here. *Irey*, 612 F.3d at 1206.

The sexual abuse committed by Day is beyond egregious and undoubtedly inflicted irreparable harm on the child victims. Two of Day's victims spoke to the government about the shame they felt after he sexually abused them. PSR ¶¶ 46-48. In addition, the Supreme Court has discussed the grave and enduring harms inflicted upon minors who are victims of sexual abuse. "Long-term studies show that sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641, 2677 (2008). The significant harms inflicted and threatened by Day's conduct designate the seriousness of the offense and the need for a guideline sentence.

### C.   Adequate Deterrence to Criminal Conduct and Need to Protect the Public from Further Crimes of Day

Moreover, the deterrence factor is "particularly compelling in the child pornography context." *United States v. Pugh*, 515 F.3d 1719, 1194 (11th Cir. 2008).

The Seventh Circuit has explained why deterrence is so important for crimes involving the sexual abuse of children, including child pornography. *See United States*

*v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *Id.* at 672. If sentences are more severe, like-minded individuals will be deterred, and the incarceration of those convicted of such crimes will help to protect the public. Furthermore, the Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class...." *Smith v. Doe*, 538 U.S. 84, 103 (2003). Day's pattern of sexual exploitation of minors is evidence of his recidivism. Additionally, even after being searched at the border, and interviewed by federal agents not once but twice, Day still continued to prey on children. Day's predatory behavior even with the knowledge that he was under the lens of a federal agency demonstrates that his likelihood to recidivate is high. Accordingly, there is a strong need to protect the public from further crimes of Day.

In an effort to abate similar conduct in the future, this Court should impose a severe sentence that will serve as a warning to individuals considering similar conduct. A lengthy sentence will deter comparable activities and convey that such behavior is unacceptable and will be adjudicated harshly within the Eleventh Circuit. Moreover, there is a strong need to protect the public from further crimes of the defendant. Day has a persistent and documented history of sexually abusing children. Day has demonstrated no signs of changing his sexually exploitive ways, and he continues to pose a serious danger to society.

## V.    <u>Conclusion</u>

Day's sentence should fairly account for the history of Day's predatory nature and the scope of Day's criminal endeavors, acknowledge the harm that he has caused to the child victims, and acknowledge the severe ramifications of his actions. For the aforementioned reasons, the United States respectfully requests that this Court issue a guideline sentence based on the nature and circumstances of these offenses.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:    <u>*/s/ Candace Garcia Rich*</u>
Candace Garcia Rich
Assistant United States Attorney
Florida Bar No. 027792
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: candace.rich@usdoj.gov

Kyle P. Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section
1301 New York Ave., NW
Washington, DC 20005
Telephone: (202) 616-2842
E-mail: kyle.reynolds@usdoj.gov

**U.S. v. Christopher Day**                    **Case No. 8:19-cr-354-SDM-JSS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 18, 2021, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to the following:

Patrick Leduc, Esq.

*/s/ Candace Garcia Rich*
Candace Garcia Rich
Assistant United States Attorney
Florida Bar No. 027792
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: candace.rich@usdoj.gov